UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 1:18-cr-00155-JPH-DML |
| BYRON PIERSON, | ) ) | -01 |
| Defendant. | ) ) | |

**ORDER DENYING MOTION TO SUPPRESS**

Defendant Byron Pierson has moved to suppress "all evidence obtained directly or indirectly" from the "stop and seizure of his vehicle, and arrest of his person." Dkt. [128] at 3. For the reasons that follow, Mr. Pierson's motion is **DENIED**.

**I.
Facts & Background**

Because Mr. Pierson has not contested the government's evidence and has not designated his own evidence, the following facts are treated as undisputed unless otherwise noted. *See United States v. Juarez*, 454 F.3d 717, 719–20 (7th Cir. 2006) (finding no evidentiary hearing required on motion to suppress unless defendant "provide[s] sufficient information to enable the court to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion"); *United*

1

*States v. Clark*, 935 F.3d 558, 568 (7th Cir. 2019) ("[T]he burden is on the defendant to support his motion to suppress.").[1]

On April 15, 2018, a woman ("Complainant")[2] notified the Indianapolis Metropolitan Police Department ("IMPD") of intimidating conduct by Mr. Pierson. Dkt. 151-1 at 5, 9. IMPD Officer Minnis responded to the 1500 block of West 27th Street in Indianapolis around 6:00 p.m. and met with Complainant. *See id.* Complainant told Officer Minnis that, the day before, Mr. Pierson had followed through on a threat to "smash out the windows in her vehicle." *Id.* at 5.

She said that Mr. Pierson had returned on April 15 and threatened her again. *See id.* He told her that he would come back at 10:00 p.m. to "[b]low up" her car and "shoot the house up." *Id.* Complainant reported to police that Mr. Pierson "had a firearm in the front of [his] waistband" when he made the threat and "that he was on federal probation for a firearms[-]related case" at the time. *Id.* at 5, 9. She also provided a description of Mr. Pierson's "newer model black Dodge Charger" "with large black wheels." *Id.*

Officer Minnis then searched Mr. Pierson's criminal records and "found that [he] ha[d] been convicted of [a]rmed [r]obbery, handgun charges, along with major felony narcotic charges[,] and that he was . . . on [f]ederal [p]robation." *Id.* at 5.

---

[1] The Court also does not address the admissibility of any evidence because, for purposes of this order, "the court may rely on . . . evidence [that] would not be admissible at trial." *See, e.g., United States v. Raddatz*, 447 U.S. 667, 679 (1980).

[2] Complainant's name "is known to the parties and can be made known to the Court." Dkt. 151 at 2 n.1.

Officer Minnis informed three other IMPD officers—Officers Elliott, Shelton, and Shinn—about this report, and the officers, each in his own marked police vehicle, reported to the area around 9:15 p.m. that same day. *Id.* They were "keep[ing] an eye[] on [the Complainant's] residence and the immediate area around [it] for the possibility of locating Mr. Pierson and the black Dodge Charger." *Id.* Officers Minnis and Shelton observed a "newer black Dodge Charger with large black wheels" on the "2700 block of Riverside" and informed Officer Elliott about it. *Id.*

A few minutes later, Officer Elliott saw a vehicle matching that description and followed it. *Id.* at 6–7. He informed the other officers about the vehicle and the direction it was traveling. *Id.* at 6. Officer Elliott observed that a cover "partially blocked the upper left and right corners" and the "lower right corner" of the license plate, but he still identified the license plate number and ran the plate at 9:43 p.m. *Id.* at 6, 17. He also recorded the Charger traveling at several speeds over the posted 35-mph speed limit. *See id.* at 6 (recording speeds of 37 mph, 40 mph, and 43 mph by "pac[ing] the vehicle with [his] [c]ertified [c]alibrated [p]olice vehicle").

When Officer Minnis caught up to Officer Elliott, Officer Elliott explained that he was going to pull the car over for improper display of plates and speeding. *Id.* Officer Elliott then pulled the vehicle over. *Id.*

Officer Elliott approached the driver's side of the Dodge Charger on foot, and Officer Minnis approached the passenger side. *Id.* at 6, 9. Officer Elliott saw an adult woman sitting in the driver's seat through the driver's side mirror.

3

*Id.* at 6. Because the windows were dark, he couldn't see the other passengers, so he asked the driver to roll the back window down. *Id.* Once she rolled the window down, Officer Elliott, who had reviewed a picture of Mr. Pierson, saw a man sitting in the rear passenger's-side seat who looked like Mr. Pierson. *Id.* Officer Elliott also observed a juvenile in the front passenger seat. *Id.*

Officer Elliott asked the driver for her license and registration and asked the man for his identification, but the man said that he didn't have it and had just woken up from sleeping. *Id.* The man then found the car's registration information and told the officer that his name was Byron Pierson. *Id.* at 6, 9.

Officer Hubner arrived at the scene, so Officers Elliott and Minnis returned to their police vehicles while Officer Hubner waited by Mr. Pierson. *Id.* at 6. Officer Minnis contacted Detective Ron Gray, and they decided to order Mr. Pierson out of the vehicle to conduct a pat-down "due to his prior violent past and the allegations that he was armed and made threats to use a firearm against another person." *Id.* at 6, 9.

The three officers and Officer Snow—who had just arrived—approached the vehicle. *Id.* at 6. Officer Minnis repeatedly asked Mr. Pierson to exit the vehicle because of an investigation involving him. *Id.* at 6, 9. Officer Elliott observed and informed the other officers that Mr. Pierson's hands were shaking and that he "kept touching / patting his waist." *Id.* at 6. Mr. Pierson asked why he needed to step out, and Officer Minnis said he would explain once he was out of the vehicle. *Id.* at 9.

Mr. Pierson put his hands up, stated that he would step out, and asked them to open the door for him. *Id.* After finding the door locked, Officer Minnis told the driver to unlock it, and she did. *Id.* Officer Minnis then opened the door, and Mr. Pierson stood partially up in the vehicle with his hands up. *Id.* at 6–7.

Mr. Pierson "continuously told" the officers that he had a knife and pushed one of his hips towards the officer to show it to them. *Id.* at 7, 9. Officer Snow removed the knife, and then "Officer Minnis grabbed Mr. Pierson's right hand / wrist" and "Officer Hubner grabbed Mr. Pierson by his left wrist / hand." *Id.*

Officer Minnis asked Officer Snow to handcuff Mr. Pierson "for [o]fficer safety" given Mr. Pierson's "violent history" and "his refusal to relax for the pat down." *Id.* at 9. Either when Officer Snow pulled out handcuffs or when the officers "attempted to physically pull Mr. Pierson out of the vehicle" and "place his hands behind his back," Mr. Pierson tried to push and pull his arms away. *Id.* at 7, 9. When Officer Hubner lost control of Mr. Pierson's left hand and Mr. Pierson pulled it away, Mr. Pierson's open palm hit Officer Minnis. *Id.* Mr. Pierson then freed himself from Officer Minnis' grip on his right hand and ran away from the vehicle. *Id.* Officers Minnis, Snow, and Hubner yelled "Stop! Police!" and chased him. *Id.* Officer Elliott stayed with the vehicle and notified communications about the chase. *Id.* at 7.

Either when Officers Snow and Minnis "reached out to grab Mr. Pierson" or when he got to the top of an embankment, Mr. Pierson turned toward them.

5

*Id.* at 7, 9. His "right hand disappeared from view towards his belt line," *id.* at 9, and he "appeared to be holding onto an object near his waistline," *id.* at 7. Because Officers Snow and Minnis feared that Mr. Pierson was attempting to draw a weapon, they tased him. *Id.* at 7, 9. Mr. Pierson fell to the ground, landing on his stomach. *Id.*

Officers yelled for Mr. Pierson to place his hands behind his back, *id.* at 9, and Mr. Pierson rolled side-to-side with his hands underneath him while Officers Snow and Hubner tried to handcuff him, *id.* at 7, 9. As Officer Elliott ran towards them to help, he saw the two officers tasing Mr. Pierson for another five-second cycle. *Id.* at 7. Officer Elliott found this second round of tasing ineffective since Mr. Pierson could still move and reach under his body. *Id.*

Officer Elliott then placed his knee on Mr. Pierson's upper back, "using [his] body weight as leverage to keep [him] on the ground." *Id.* Officer Elliott grabbed Mr. Pierson's right wrist and placed it behind his back. *Id.* At this point, Officer Snow observed the handle of a pistol on Mr. Pierson's waistband and yelled "Gun, Gun, Gun!" and called for Officer Minnis to tase Mr. Pierson again. *Id.* at 7, 9. Officer Minnis tased Mr. Pierson for a third time, placed Mr. Pierson's left arm behind his back, and grabbed the gun. *Id.* Officer Elliott then handcuffed Mr. Pierson "without further incident" and requested an ambulance. *Id.* at 7, 17. A medic arrived on scene and cleared him for transport to an IMPD station. *Id.* at 7.

6

## II.
## The Exclusionary Rule

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "[T]o deter Fourth Amendment violations," trial courts are often required "to exclude unlawfully seized evidence in a criminal trial." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). But the exclusionary rule applies "only where its deterrence benefits outweigh its substantial social costs," and courts should treat "[s]uppression of evidence" as a "last resort" and not a "first impulse." *Id.* (citation omitted).

## III.
## Discussion

Mr. Pierson has moved to suppress "all evidence obtained directly or indirectly" from the "stop and seizure of his vehicle, and arrest of his person, including . . . a firearm" allegedly in his possession. Dkt. 128 at 3.[3] The government responds that each of the officers' actions— (1) the traffic stop, (2) the decision to patdown Mr. Pierson, (3) the attempted patdown, and (4) the retrieval of the firearm after Mr. Pierson's flight—were lawful. *See* dkt. 151.

---

[3] Mr. Pierson's motion also seeks to exclude his "statements at the scene of his arrest, and interrogation at the police substation." Dkt. 128 at 3. However, the government informed the Court at the Final Pretrial Conference that it did not intend to offer any statements made by Mr. Pierson on the date of arrest at trial. *See* dkt. 169. In response, counsel for Mr. Pierson agreed that the government's position rendered this part of his motion to suppress moot. *Id.* Therefore, this order does not address whether Mr. Pierson's statements on the day of his arrest are subject to the exclusionary rule.

### 1. Traffic Stop

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *Arizona v. Johnson*, 555 U.S. 323, 332 (2009) (passengers are "seized, just as the driver is"). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren*, 517 U.S. at 810. But "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.*

The government contends that the traffic stop was lawful because Officer Elliott had probable cause to believe that the driver had committed traffic violations by driving above the posted speed limit and by driving with an obscured license plate. Dkt. 151 at 5–8. Mr. Pierson has not addressed or responded to this argument. *See* dkt. 128.

Here, Officer Elliott observed that a cover "blocked" or "partially blocked" three corners of the license plate, and he recorded the Charger traveling at several speeds over the posted 35-mph speed limit. *See* dkt. 151 at 6 (recording speeds of 37 mph, 40 mph, and 43 mph). Indiana's traffic code prohibits both obstructed license plates and speeding. *See* Ind. Code § 9-18-1-4-4(b) (infraction for a person's license plate to be "obstructed" by "accessories, or other opaque objects"); Marion County Code of Ordinances § 441-323 ("[I]t shall be prima facie unlawful for any person to drive . . . at a speed in excess

8

of" 35 mph from Kessler Boulevard between 16th St. and 38th St.); *see* Ind. Code § 9-21-5-6.  Mr. Pierson has not offered argument or evidence questioning these assertions.  And although the government admits that "the officers intended to conduct such a stop" even "if they had not observed a traffic violation," *see* dkt. 151 at 9, "constitutional reasonableness of traffic stops" does not "depend[] on the actual motivations of the individual officers involved," *Whren*, 517 U.S. at 813.  As a result, the officers had probable cause to believe that the Dodge Charger's driver violated Indiana's traffic code.  That rendered the traffic stop reasonable under the Fourth Amendment.

### 2. Decision to conduct a patdown

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that "an investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures" under two conditions.  *Johnson*, 555 U.S. at 326.  First, the investigatory stop must be lawful.  *Id.*  And second, if the officers proceed from a stop to a frisk, they "must reasonably suspect that the person stopped is armed and dangerous."  *Id.* at 326–27.

"[W]henever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation," the first *Terry* condition—a lawful investigatory stop—is met.  *Id.* at 327.  Because the traffic stop here was lawful, *see supra* p. 8–9, the issue is whether the police's attempted patdown was lawful—*i.e.*, whether the officers had a reasonable suspicion that Mr. Pierson was armed and dangerous.  *See Johnson*, 555 U.S.

9

at 332 (holding that, during traffic stops, officers "may perform a patdown of . . . any passengers upon reasonable suspicion that they may be armed and dangerous.").

A "mere hunch does not create reasonable suspicion," but the level of suspicion required "is considerably less demanding than proof . . . by a preponderance of the evidence, and obviously less than is necessary for probable cause." *See Kansas v. Glover*, 140 S. Ct. 1183, 1187–88 (2020) ("[T]o be reasonable is not to be perfect.") (citation omitted). "The standard takes into account the totality of the circumstances—the whole picture"—and "depends on the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Id.* at 1188, 1190 (citations omitted).

Here, the officers had reasonable suspicion that Mr. Pierson was armed and dangerous. Officer Minnis met with Complainant earlier that day. *See* dkt. 151-1 at 9. Complainant told Officer Minnis that Mr. Pierson had followed through on an earlier threat to "smash out the windows in her vehicle" the night before, threatened to return that night at 10:00 p.m. to "[b]low up" her car and "shoot the house up," that he "had a firearm in the front of [his] waistband" when he made the threat, and "that he was on federal probation for a firearms[-]related case." *Id.* at 5, 9. She also gave the officer a description of Mr. Pierson's "newer model black Dodge Charger" "with large black wheels." *Id.* After searching Mr. Pierson's criminal records, Officer Minnis then "found that Mr. Pierson ha[d] been convicted of [a]rmed [r]obbery, handgun charges, along

10

with major felony narcotic charges[,] and that he was . . . on [f]ederal [p]robation." *Id.* at 5. Officer Minnis informed the other officers about this information. *See id.*

The events that followed corroborated facts in the Complainant's statements. Officers Shelton and Minnis observed a "newer black Dodge Charger with large black wheels" driving two streets over from Complainant's house after 9:15 p.m. that night. *See* dkt. 151-1 at 5; *see also Navarette v. California*, 572 U.S. 393, 398 (2014) (noting that a tipster "who is proved to tell the truth about some things is more likely to tell the truth about other things").

After conducting a traffic stop on the vehicle, Officer Elliott saw a man seated in the back seat who "matched the picture that [he] had of Mr. Pierson." Dkt. 151-1 at 6. Officer Elliott observed Mr. Pierson breathing rapidly and his hands shaking. *Id.* Mr. Pierson also told Officer Elliott his name. *See id.* After the officers consulted a detective, they decided to "get Mr. Pierson out of the vehicle and conduct a pat down due to his prior violent past and the allegations that he was armed and made threats to use a firearm against another person." *Id.*

Given these facts, the officers had more than a "hunch" that Mr. Pierson was armed and dangerous. *Cf. Terry*, 392 U.S. at 22 (mere "hunch" insufficient to satisfy reasonable-suspicion standard). They were aware of the Complainant's report of Mr. Pierson's threatening behavior, corroboration of her description of the vehicle and of the timing of its arrival in her neighborhood that night, Mr. Pierson's criminal history involving firearms, and

11

Mr. Pierson's verbal confirmation of his identity. They thus had at least "reasonable suspicion" that Mr. Pierson was armed and dangerous, which permitted them to attempt a patdown. *See, e.g., United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) (applying *Terry* standard).

### 3. Attempted patdown

In attempting the patdown, however, the officers' actions straddle the line between a *Terry* stop (requiring only reasonable suspicion) and an arrest (requiring probable cause). *See Dunaway v. New York*, 442 U.S. 200, 202–214 (1979) (holding that "full-fledged arrest" requires probable cause).[4] However, the Court does not need to decide which type of seizure occurred here because the officers, by this point, had probable cause to believe that Mr. Pierson had committed a criminal offense.

Probable cause is a "practical, nontechnical conception" that courts assess with a "totality-of-the-circumstances approach." *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983). Although no "numerically precise degree of certainty" corresponds with the probable-cause standard, it "means less than evidence which would justify condemnation" and requires "only the probability . . . of criminal activity." *Id.* at 234 (citations omitted). "To determine whether an officer had probable cause to arrest an individual, [courts] examine the events

---

[4] *See United States v. Lechuga*, 925 F.2d 1035, 1039 (7th Cir. 1991) (noting "the dim and wavering boundary that distinguishes *Terry* stops from arrests"); *compare Howell v. Smith*, 853 F.3d 892, 898 (7th Cir. 2017) (recognizing "officer safety and the possibility of the presence of a weapon" as "[c]hief" among a "limited set of circumstances in which handcuffs are appropriate without converting a *Terry* stop into a full arrest") *with Torres v. Madrid*, No. 19-292, 2021 WL 1132514, at *4–10 (U.S. Mar. 25, 2021) (agreeing with "[t]he common law rule . . . that the application of force gives rise to an arrest, even if the officer does not secure control over the arrestee").

12

leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). An "arrest may be supported by probable cause that the arrestee committed any offense, regardless of the crime charged or the crime the officer thought had been committed." *United States v. Reedy*, 989 F.3d 548, 554 (7th Cir. 2021).

After deciding to conduct a patdown, Officer Minnis repeatedly asked Mr. Pierson to exit the vehicle, explaining that there was an investigation involving him. Dkt. 151-1 at 6; *see Maryland v. Wilson*, 519 U.S. 408, 415 (1997) ("hold[ing] that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop"). Officer Elliott observed Mr. Pierson's breathing "get[ting] faster and faster" and that "his hands were shaking very badly." Dkt. 151-1 at 6. He also noticed that Mr. Pierson "would look away from" the officers, "glancing down towards his waist and[,] on several occasions[,] take his hands and touch / pat towards his waist." *Id.* Officer Elliott told Officers Snow and Minnis about these behaviors, *id.*, and Officer Minnis also noticed that Mr. Pierson's hands were shaking and that he "avoided eye contact," *id.* at 9.

When Officer Minnis ordered Mr. Pierson to step out of the car, Mr. Pierson asked why and, after a "short time," stated that he would step out. *Id.* at 9. Mr. Pierson "put both of his hands up" and asked the officers "to open the door for him." *Id.* After telling the driver to unlock the door, Officer Minnis opened it, and Mr. Pierson stepped out slowly. *Id.* Mr. Pierson told the officers

13

that he had a knife and angled his hip towards them to show it to them. *Id.* at 7, 9. Officers Minnis and Hubner each grabbed one of Mr. Pierson's hands, and Officer Snow removed the knife. *Id.* Officer Minnis then decided to handcuff Mr. Pierson "for [o]fficer safety" given his "refusal to relax for the pat down," and he asked Officer Snow to pull the handcuffs out. *Id.* at 9.

By the time the officers restrained Mr. Pierson, they were thus aware of Complainant's report of Mr. Pierson's threatening behavior, corroboration of her description of the vehicle and of the timing of its arrival in her neighborhood, Mr. Pierson's criminal history involving felony firearm offenses and his supervised-release status, and Mr. Pierson's verbal confirmation of his identity. They had also observed Mr. Pierson's reluctance to exit the vehicle, his shaking hands, and his frequent glances at and patting of his waist. And they had recovered a knife from his person. These facts, viewed as a whole, support finding that the officers had probable cause that Mr. Pierson had committed an offense. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (An officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.").

At the very least, a reasonable officer would have had probable cause to believe that Mr. Pierson had violated a term of his supervised release and engaged in unlawful intimidation, *see* Ind. Code § 35-45-2-1, and vandalism, *see* Ind. Code § 35-43-1-2.[5] *See United States v. Greco*, 938 F.3d 891, 895 (7th

---

[5] For these reasons, the Court does not address whether officers also had probable cause to believe that Mr. Pierson unlawfully possessed a firearm. *See* 18 U.S.C. § 922(g) (federal crime for felon-in-possession); Ind. Code § 35-47-4-5 (state crime for felon-in-possession)

14

Cir. 2019) (finding it "enough to establish probable cause for [an] arrest" "when a defendant violate[s] a term of his supervised release"). First, Complainant had told officers that Mr. Pierson was "on federal probation for a firearms[-]related case." *Id.* at 5, 9. And Mr. Pierson's supervised release on his last federal felon-in-possession conviction required him not to "own, possess, or have access to a firearm . . . or dangerous weapon" and to "not commit another federal, state, or local crime." *See United States v. Pierson*, No. 1:12-cr-26, dkt. 65. The officers knew that Mr. Pierson possessed a knife. Dkt. 151-1 at 7, 9. This is enough for probable cause. *See Black v. Petitinato*, 761 F. App'x 18, 22 (2d Cir. 2019) (probable cause for arrest based on defendant's possession of knives, which violated his parole condition barring him from "possess[ing] dangerous weapons").

Next, the officers had corroborated enough details of Complainant's story to develop probable cause that Mr. Pierson had engaged in intimidation, *see* Ind. Code § 35-45-2-1, and vandalism, *see* Ind. Code § 35-43-1-2. *See, e.g.*, Dkt. 151-1 at 5, 9 (noting Complainant's report that Mr. Pierson "smash[ed] out the windows in her vehicle" and threatened to "[b]low up" her car and "shoot the house up"). As a result, the officers had probable cause to seize Mr. Pierson.

### 4. Retrieval of the gun

After the officers first attempted to handcuff Mr. Pierson, he pulled his arms away from the two officers and ran off. Dkt. 151-1 at 7, 9. The police yelled, "Stop! Police!" but he did not stop, and a chase ensued. *Id.* At one

15

point during the chase, Officer Minnis observed Mr. Pierson turn back, "looking over his right shoulder as his right hand disappeared from view towards his belt line." *Id.* at 9. Officer Minnis "fear[ed] that Mr. Pierson was about to pull a firearm," so he discharged his taser, and Officer Snow also tased Mr. Pierson. *Id.* At some point during the following encounter, Officer Snow "observed a black handle of a pistol on Mr. Pierson's left waistband," *id.* at 7, and yelled "Gun, Gun, Gun!" *id.* at 9. Officer Minnis eventually grabbed "the gun from beneath Mr. Pierson[]." *Id.* at 9.

Given Mr. Pierson's flight after the attempted patdown and the totality of the officers' observations, the officers had probable cause to arrest Mr. Pierson for another offense at this point. *See* Ind. Code § 35-44.1-3-1 (state crime for a person who knowingly or intentionally "flees from a law enforcement officer"); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting that "[h]eadlong flight . . . is the consummate act of evasion"). And once Officer Snow saw the gun's handle, the officers had probable cause to believe that Mr. Pierson unlawfully possessed a firearm. For these reasons, the arrest was supported by probable cause and thus the retrieval of the gun was a valid search incident to arrest. *See United States v. Robinson*, 414 U.S. 218, 235 (1973) ("hold[ing] that in the case of a lawful custodial arrest a full search of the person . . . is . . . a 'reasonable' search under th[e] [Fourth] Amendment.").

Because the government's designated evidence shows that the traffic stop, the officers' decision to conduct a patdown, the attempted patdown, and their subsequent retrieval of the gun after Mr. Pierson's flight were all

16

reasonable under the Fourth Amendment, Mr. Pierson has shown no basis for suppression of evidence.[6] *See Clark*, 935 F.3d at 568.

## IV.
## Conclusion

For the reasons discussed above, Mr. Pierson's motion, dkt. [128], is **DENIED**.

**SO ORDERED.**

Date: 4/8/2021

James Patrick Hanlon

James Patrick Hanlon
United States District Judge
Southern District of Indiana

---

[6] Because this order denies Mr. Pierson's motion on other grounds, it does not address the government's remaining arguments, including those on the inevitable-discovery or good-faith doctrines. *See* dkt. 151 at 12–16.

Distribution:

Joseph R. Eggert
ATTORNEY AT LAW
tlyons@600mainlaw.com

M. Kendra Klump
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kendra.klump@usdoj.gov

Kelsey Massa
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kelsey.massa@usdoj.gov

Patrick J. Renn
prenn@600westmain.com